UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED SATES OF AMERICA | ) | |
| | ) | MISC. NO. ____ |
| v. | ) | |
| | ) | **Filed Under Seal** |
| TEMITOPE D. OLUWA – BAKARE | ) | |
| OGUNBIYI, also known as "TEMI," | ) | |
| "DEBORAH," "DEBRA," "DEBBIE," | ) | |
| and "DEBORAH BROWN," | ) | |
| | ) | |
| Defendant. | ) | |

AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANT

I.      IDENTITY OF THE AFFIANT

I, Jynika Craig, being duly sworn, state:

1.      I am a Special Agent of the Federal Bureau of Investigation (hereinafter "FBI"). From 2015 to the present, I have been assigned to a white-collar crime squad at the FBI's Washington Field Office in the District of Columbia (D.C.), specifically focused on the investigation of health care fraud and other health care crimes. My investigative focus during the past two years has been on fraud against government programs. I have received training in general law enforcement and criminal investigations, and I have attended training programs focused on health care crimes. I have investigated allegations of health care fraud, false claims, and money laundering.

2.      I am assigned to this investigation and my involvement has included, but is not limited to, interviewing witnesses, reviewing Medicaid billing claims and medical records associated with Medicaid recipients, as well as interviewing a Confidential Human Source

"(CHS").

## II. REASON FOR AFFIDAVIT

3.      This affidavit is made in support of a criminal complaint and arrest warrant

charging TEMITOPE D. OLUWA-BAKARE OGUNBIYI ("OGUNBIYI"), also known as

"TEMI,"  "DEBORAH," "DEBRA," "DEBBIE," and "DEBORAH BROWN," with violations

of 18 U.S.C. §§ 1347 (Health Care Fraud) and 1349 (Conspiracy to Commit Health Care Fraud),

18 U.S.C. § 1035 (Health Care False Statements), and 42 U.S.C. §§ 1320a, 1320(b), 1320(f)(1 –

2) (Anti-Kickback).

4.      OGUNBIYI is a naturalized American citizen, who resides in Bowie, Maryland.

Since approximately January 11, 2013, through the present, OGUNBIYI has been employed as a

Personal Care Aide ("PCA") providing home health care services to residents of the District of

Columbia that receive Medicaid.  OGUNBIYI uses a unique National Provider Information

("NPI") Number to submit timesheets to home health agencies ("HHA") that in turn bill

Medicaid and pay OGUNBIYI.

5.      On or about October 31, 2016, the D.C. Department of Health Care Finance

("DHCF") opened an investigation to identify the top ten paid PCAs in the D.C. Medicaid

Program for calendar years 2014 through 2016.  DHCF identified OGUNBIYI as *the highest

paid* PCA in 2014 and 2015.  In March 2018, the FBI along with DHCF, Department of Health

& Human Services, Office of Inspector General ("HHS-OIG"), and the D.C. Medicaid Fraud

Control Unit ("MFCU"), opened an investigation into allegations that OGUNBIYI defrauded and

continues to defraud D.C. Medicaid by submitting and causing to be submitted false claims

concerning the provision of PCA services.

6.       The investigation confirmed those allegations, revealing that OGUNBIYI

obtained two NPI numbers and has been submitting false claims under two names:  OGUNBIYI, using NPI ending in -4649 and DEBORAH BROWN using NPI ending in -2761.  The false claims can be categorized broadly as follows: (1) claims purporting that OGUBIYI provided services in excess of 20 hours in a given day; (2) claims purporting that OGUNBIYI provided services to multiple Medicaid beneficiaries in overlapping hours for different HHAs; (3) claims purporting that OGUNBIYI provided services to Medicaid beneficiaries to whom she provided no care at all; (4) claims purporting that OGUNBIYI provided services to Medicaid beneficiaries while she was not in the United States; and (5) claims that were tainted by the payment of illegal kickbacks to Medicaid beneficiaries to secure their signatures on fraudulent timesheets.  The investigation further revealed that OGUNBIYI conspired with at least one other PCA in a scheme to defraud D.C. Medicaid by submitting and causing to be submitted false claims for services not rendered and that were tainted by the payment of illegal kickbacks.

7.      Based on a review of the Medicaid billing claims submitted under OGUNBIYI's two NPI numbers, between January 1, 2014, and September 30, 2018, Medicaid paid for 229,896 units[1] (or 57,474 hours) of PCA services allegedly provided by OGUNBIYI at a loss of approximately $1,071,247.12.

8.      If a PCA worked 24 hours each day and 365 days each year, the maximum number of possible hours worked in one year is 8,760, or approximately 730 hours each month. According to OGUNBIYI's submitted claims, in the 57 months between January 2014 and September 2018, she worked on average 992 hours per month and 11,904 hours each year.  A review of her claims data shows that using two NPI numbers, OGUNBIYI sometimes billed for as many as 368 units (or 92 hours) of work in a single day.

---

[1] One "unit" is equivalent to 15 minutes.  There are four units in an hour and 96 possible units in a 24-hour period.

9.      The claims data further shows that during that 57 month period, OGUNBIYI was employed by approximately eighteen HHAs:  HHA-1 through HHA-18 (collectively the "eighteen HHAs").   The eighteen HHAs were registered to do business in the District of Columbia to provide home health services to Medicaid beneficiaries.  OGUNBIYI also purported to provide PCA services for up to fifty-one (51) different Medicaid beneficiaries in that time period.

10.      The facts and information contained in this affidavit are based on my personal knowledge of the investigation and the observations and reports of other law enforcement officers. This affidavit is not intended to include each and every fact and matter observed by me or known to the government relating to the subject matter of this investigation. Instead, this affidavit contains only those facts which are necessary to establish that probable cause exists.

### III.      OVERVIEW OF DISTRICT OF COLUMBIA MEDICAID PROGRAM AND HOME HEALTH CARE SERVICES

11.      Medicaid is a "health care benefit program" as defined by 18 U.S.C. § 24(b).  It was established by Congress under Title XIX of the Social Security Act of 1965 (the "Medicaid Act"). Medicaid was overseen and administered by the Centers of Medicare and Medicaid Services ("CMS"), an agency within the United States Department of Health and Human Services ("HHS"). The federal government provides the funding for 70 – 80% of Medicaid and the District provides the remaining funds. Through September 30, 2008, Medicaid was administered by D.C.'s Department of Health's Medical Assistance Administration; however, since October 1, 2008, Medicaid has been administered by DHCF, which is located at 441 4th Street, N.W., Washington, D.C.  Medicaid provides health insurance coverage to residents of the District of Columbia whose incomes are below a certain financial threshold as measured against the poverty line.  Recipients of medical services covered by Medicaid are referred to as

"beneficiaries."  In the District of Columbia, a beneficiary is assigned a DCID, a unique 8-digit

number that is used to bill Medicaid for services provided to the beneficiary.

12.     In the District of Columbia, HHAs can provide certain services including skilled

nursing, home health aide, and personal care services.  Personal care services are intended to

assist Medicaid beneficiaries in performing the activities of daily living, known as "ADLs."

ADLs include the ability to get in and out of bed, bathe, dress, eat out, take medication

prescribed for self-administration, and engage in toileting.

13.     To be eligible to participate in Medicaid, HHAs must agree to abide by all federal

and local laws, regulations, and program manuals governing Medicaid reimbursements.  To

receive reimbursement from Medicaid, HHAs operating in the District of Columbia are required

to submit a claim, either electronically or in paper form, to DHCF.  As part of the claim, an HHA

must provide certain information, such as the name of the Medicaid beneficiary, the date of

service, the type of service and corresponding billing code, the amount of time a service was

provided, and the amount of money being claimed by the HHA as payment from Medicaid.

Medicaid only pays for services that are medically reasonable and necessary, and that are

actually provided as claimed.

14.     HHAs employ and contract with personal care aides ("PCAs") to provide services

to Medicaid beneficiaries.   Under the Medicaid rules, a PCA must meet certain qualifications.

Those qualification include: (a) being at least 18 years of age; (b) a citizen of the United States or

an alien who is lawfully authorized to work in the United States; (c) completing a home health

aide training program that involves at least seventy-five (75) hours of classroom training with at

least sixteen (16) hours devoted to supervised practical training; (d) passing a competency

evaluation for the services which the PCA is required to perform consistent with the

requirements set forth in 42 C.F.R.  § 484.36;  (e) obtaining certification in cardiopulmonary

resuscitation and maintaining such certification annually; (f) demonstrating that the PCA is free

from communicable disease as confirmed by an annual PPD Skin Test or documentation from a

primary care physician stating that the person is free from communicable disease; and (g)

passing a criminal background check.   PCAs are issued a unique 10-digit National Provider

Identification number, the "NPI," which the HHA uses to bill Medicaid for services rendered to a

beneficiary based on timesheets submitted by the PCA.

15.     To receive personal care services under Medicaid, a beneficiary must obtain a

prescription from a doctor, informally known as an "intake." Medicaid only pays for personal

care services if the doctor determines after a face-to-face physical examination that the

beneficiary has functional limitations in one or more ADLs.  DHCF regulations that went into

effect in November 2013, clarified that the doctor prescribing the intake must be the

beneficiary's primary care physician with whom the beneficiary had a pre-existing doctor-patient

relationship.

16.     A beneficiary takes the intake to a HHA that in turn arranges for a registered

nurse to perform an initial assessment of the beneficiary's functional status and needs.  The nurse

drafts a Plan of Care ("POC") for the beneficiary based on the assessment. The POC is required

to specify the frequency, duration, and expected outcome of the personal care services and is

supposed to be tailored to address the individual needs of the beneficiary.

17.     The HHA then assigns a PCA to provide the personal care services set forth in the

POC to the beneficiary.  Services are typically provided in the beneficiary's home and PCAs

must document the provided care on a timesheet that is submitted to the HHA.   The timesheet is

supposed to accurately reflect the date the PCA provided services, the itemized services

rendered, the amount of time spent providing each service, and the location at which the services were provided. Timesheets are supposed to be signed each day by both the PCA and the beneficiary.  However, a single timesheet can contain a full week of services.  HHAs use the timesheets to determine and justify the hours of services for which the HHA files a reimbursement claim with Medicaid.

18.     Chapter 50, Title 29, of the District of Columbia Municipal Regulations (DCMR), entitled Medicaid Reimbursement for Personal Care Services, states that "PCA services shall not be provided in a hospital, nursing facility, intermediate care facility, or other living arrangement which includes personal care as part of the reimbursed service."

19.     As outlined in Section 6.3 Interrelationship of Providers, of the D.C. Medicaid MMIS Provider Billing Manual, "Providers are prohibited from referring or soliciting beneficiaries directly or indirectly to other providers for financial consideration.  Providers also are prohibited from soliciting, receiving or offering kickbacks; payments, gifts, bribes, or rebates for purchasing; leasing, ordering, arranging for, recommending purchasing, leasing; ordering for goods, facilities, or items for which payment is made through the D.C. Medicaid Program."

**IV.     FACTS SUPPORTING PROBABLE CAUSE**

20.     As mentioned above, this investigation has revealed that OGUNBIYI alone and together with another PCA, submitted or caused to be submitted false timesheets to several HHAs for payment for PCA services not rendered to beneficiaries.  The HHAs subsequently sought and received payments from D.C. Medicaid based on OGUNBIYI's fraudulent timesheets.

21.     During the course of the investigation, law enforcement obtained, *inter alia*, OGUNBIYI's bank records, phone records, employment records, tax returns, patient files, and

D.C. Medicaid billing claims submitted with her two NPI numbers ending in -4649 and -2761. Law enforcement also interviewed witnesses, including a CHS, and participated in the recording of telephonic and non-telephonic communications.

### A.    BILLING AS OGUNBIYI UNDER NPI ENDING IN -4649

22.    A review of the D.C. Medicaid claims data for OGUNBIYI's NPI ending in -4649, reveals that she worked for at least nine HHAs and purported to provide PCA services to up to thirty-seven different Medicaid beneficiaries.  OGUNBIYI used the NPI ending in -4649, for the majority of her billing between January 1, 2014, and September 27, 2018.

### Billing for Days Exceeding 20 Hours of Service

23.    A review of twenty-two months of D.C. Medicaid claims data from January 1, 2014, through October 24, 2015, shows that OGUNBIYI submitted timesheets claiming that she provided *twenty hours or more* of PCA services to several Medicaid beneficiaries for several HHAs, each day.  During this timeframe, D.C Medicaid was fraudulently billed and paid HHAs on OGUNBIYI's behalf, approximately $623,000**.**  That amount reflects *658 days* on which OGUNBIYI allegedly worked between *20 and 71 hours* each day for *as few as three and as many as ten beneficiaries*, and for between *three to eight HHAs*, per day.

24.    For example, on May 9, 2014, OGUNBIYI caused D.C. Medicaid to be billed for 284 units (or 71 hours**)** of PCA services for *nine* beneficiaries associated with *seven* HHAs.  In addition, a review of the timesheets submitted by OGUNBIYI for the majority of the nine beneficiaries showed *overlapping hours* of services.  Table 1 below further illustrates details gathered from the review of OGUNBIYI's timesheets and D.C. Medicaid claims data for May 9, 2014.

**TABLE 1**

| Date of Service | Timesheet Beginning Time | Timesheet End Time | Home Health Agency | Beneficiary | Hours of Work Claimed | Amount Paid |
|---|---|---|---|---|---|---|
| May 9, 2014 | 6:30:00 AM | 2:30:00 PM | IMMACULATE | B-1 | 8 | $130.56 |
| | 7:00:00 AM | 1:00:00 PM | HUMAN TOUCH | B-2 | 6 | $104.40 |
| | 7:00:00 AM | 3:10:00 PM | PREMIER | B-3 | 16 | $278.40 |
| | 7:00:00 AM | 3:00:00 PM | T & N | B-4 | 8 | $139.20 |
| | 3:00:00 PM | 11:00:00 PM | VMT | B-5 | 8 | $139.20 |
| | 3:00:00 PM | 11:00:00 PM | IMMACULATE | B-6 | 8 | $130.56 |
| | 3:30:00 PM | 9:30:00 PM | KBC | B-7 | 6 | $104.40 |
| | 7:00:00 AM | 10:00:00 AM | JD NURSING | B-8 | 3 | $52.20 |
| | 10:30:00 AM | 6:30:00 PM | JD NURSING | B-9 | 8 | $139.20 |
| 9-May Total | | | | | 71 | $1,218.12 |

25.     Similarly between April 22 through April 25 and April 28 through May 2, 2014, OGUNBIYI billed for *ten* beneficiaries, through *nine* HHAs, for a total of 2556 units (or 639 hours) of care across a total of nine days.[2]  A review of timesheets submitted by OGUNBIYI for the majority of the ten beneficiaries showed *overlapping hours* of care.  Based on D.C. Medicaid claims data for these nine dates, OGUNBIYI caused a loss of $10,954 to the Medicaid program.[3]

**Billing while Out of the United States**

26.     The investigation further revealed that OGUNBIYI billed Medicaid for services allegedly provided to beneficiaries, while she was outside of the United States.  During the period of March 15, 2017, through March 28, 2017, OGUNBIYI caused Medicaid to be fraudulently billed approximately $1,616 for PCA serves she supposedly provided to B-3. Records received from British Airways confirm that OGUNBIYI was not in the D.C. area nor the United States during that timeframe and thus, she could not have provided the services for which Medicaid was billed. The British Airways records show that OGUNBIYI traveled from

---

[2] There are only 216 hours in a nine day period.

[3] OGUNBIYI billed for 260 units (or 65 hours) of PCA care each day for nine beneficiaries on April 26 and April 27, 2014.

Dulles International Airport (Washington, D.C.) to Lagos, Nigeria, on March 15, 2017, and returned to the United States on March 28, 2017. Based on a review of the D.C. Medicaid claims data, OGUNBIYI caused a loss of approximately $1,616 to the Medicaid program.

27.     Similarly, from January 19, 2017, through February 4, 2017, OGUNBIYI caused D.C. Medicaid to be fraudulently billed approximately $1,939 for PCA services she purportedly provided to B-3. Records received from British Airways confirm that OGUNBIYI was not in the D.C. area nor the United States during that timeframe and thus, could not have provided the services for which Medicaid was billed.  The British Airways records show that OGUNBIYI traveled from Dulles International Airport (Washington, D.C.) to Lagos, Nigeria, on January 19, 2017, and returned to Dulles International Airport on February 4, 2017.

28.     From March 25, 2016, through April 6, 2016, OGUNBIYI caused D.C. Medicaid to be fraudulently billed approximately $2,082 for PCA services she purportedly provided to B-3 and B-10. Records received from Emirates Airlines confirm that OGUNBIYI was not in the D.C. area nor the United States during that timeframe and thus, could not have provided the services for which Medicaid was billed.  The Emirates Airline records show that OGUNBIYI traveled from Dulles International Airport (Washington, D.C.) to Lagos, Nigeria, on March 25, 2016, and returned to Dulles International Airport on April 6, 2016.

29.     From February 16, 2014 through February 23, 2014, OGUNBIYI caused D.C. Medicaid to be fraudulently billed approximately $7408 for PCA services she purportedly provided to B-2, B-6, B-1, B-7, B-11, B-3, B-4, and B-5. Records received from United Airlines confirm that OGUNBIYI was not in the D.C. area nor the United States during that timeframe and thus, could not have provided the services for which Medicaid was billed.  United Airlines records show that OGUNBIYI traveled from Dulles International Airport (Washington, D.C.) to

Lagos, Nigeria.

30.     From December 25, 2013, through January 8, 2014, OGUNBIYI caused D.C. Medicaid to be fraudulently billed approximately $12,988 for PCA services she purportedly provided to B-2, B-12, B-3, B-4, B-5, B-6, B-1, and B-7. Records received from British Airways confirm that OGUNBIYI was not in the D.C. area nor the United States during that timeframe and thus, could not have provided the services for which Medicaid was billed.  British Airways records show that OGUNBIYI traveled from Dulles International Airport (Washington, D.C.) to Lagos, Nigeria.

**Payment of Illegal Kickbacks to Beneficiaries**

31.     OGUNBIYI also caused the submission of false claims to D.C. Medicaid under NPI ending in -4649 for PCA services she did not provide and that were tainted by kickback arrangements with at least two identified beneficiaries.

32.     On October 26, 2017, law enforcement interviewed B-10 who identified OGUNBIYI from a photograph.  According to B-10, in 2016, OGUNBIYI was supposed to provide it with PCA services on the weekend.  However, OGUNBIYI told B-10 that she would be unable to service it on the weekends, and instead offered to pay B-10 $30 every two weeks. B-10 accepted the money from OGUNBIYI.  B-10 added that OGUNBIYI would pick B-10 up in front of its residence and drive it around the block in OGUNBIYI's car as it was being paid and signing blank timesheets for OGUNBIYI.  An analysis of D.C. Medicaid claims from the period February 20, 2016, through September 10, 2016, shows that OGUNBIYI caused a loss to Medicaid of approximately $9,477, for services not provided to B-10 and tainted by the payment of unlawful kickbacks.

33.     On June 30, 2017, law enforcement interviewed B-2, who indicated that "TEMI"

was its PCA.  Law enforcement knew from its investigation that OGUNBIYI used variations of

her full name with different beneficiaries, including "TEMI."  According to B-2, OGUNBIYI

had it sign timesheets for days she did not go to work. OGUNBIYI also dropped off money to B-

2 and then left its residence without providing any PCA services.  A review of D.C. Medicaid

claims revealed that OGUNBIYI started submitting timesheets for B-2 on or about January 27,

2013.  At the time, OGUNBIYI was billing daily for three other beneficiaries, making B-2 her

fourth client.  Based on the interview of B-2, the fact that it was impossible for OGUNBIYI to

provide services to four patients a day for eight hours each, and the payment of kickbacks to B-2,

OGUNBYI caused D.C. Medicaid to be fraudulently billed for approximately $73,980 between

January 1, 2014 and November 2, 2016.

### Billing During Patient Hospitalization

34.     OGUNBIYI also caused the submission of false claims to D.C. Medicaid under

NPI ending in -4649 for PCA services she did not provide during the hospitalization of at least

two beneficiaries.

35.     From May 20, 2015 through May 28, 2015, B-2 was admitted to Georgetown

University Hospital.  Through a review of D.C. Medicaid claims data and B-2's hospital records,

it was determined that OGUNBIYI fraudulently billed Medicaid for six hours of PCA services

she could not have provided to B-2, causing a loss to D.C. Medicaid of approximately $113.

36.     On or around August 2, 2014 through on or around August 5, 2014, B-2 was

admitted to Howard University Hospital.   A review of D.C. Medicaid claims data revealed that

OGUNBIYI's NPI was used to bill Medicaid for PCA service she purportedly provided to B-2

during the aforementioned period.  OGUNBIYI caused D.C. Medicaid to be fraudulently billed a

total of 24 hours across four days, and a loss to Medicaid of approximately $417.

37.     During the period of March 11, 2014 through on or around March 16, 2014, B-4 was admitted to George Washington University Hospital.  A review of D.C. Medicaid claims data and B-4's hospital records revealed that OGUNBIYI fraudulently billed D.C. Medicaid for PCA services she purportedly provided to B-4 during the aforementioned period.  OGUNBIYI caused D.C. Medicaid to be fraudulently billed for 48 hours of PCA services that she could not have provided because B-4 was hospitalized, thus causing a loss of approximately $782 to the Medicaid program.

### Receipt of Payment for Services Not Rendered

38.     An examination of seven known bank accounts for OGUNBIYI revealed that she used variations of her name to open accounts at several financial institutions.  OGUNBIYI used the following names: Temitope D. Ogunbiyi, Deborah Brown, Temitope D. Oluwa Bakare Ogunbiyi, Temitope Deborah Oluwwa-Bakare Ogunbiyi, and Temitope Deborah O. Ogunbiyi.

39.     Analysis conducted across the seven known OGUNBIYI bank accounts revealed direct deposits and check deposits from up to eight HHAs.  For instance, from January 10, 2014, through November 13, 2015 (when she billed 20 or more hours a day), approximately $129,016 worth of checks from as many as seven HHAs were deposited within OGUNBIYI's known bank accounts.  Also noted was the frequency of deposits, as they occurred almost every two weeks and on Fridays.

40.     Your affiant also is aware that PCAs often cash their HHA paychecks at check cashing and other non-bank institutions shortly after receiving them to avoid the check bouncing.  OGUNBIYI may have done so with some of her paychecks.

41.     OGUNBIYI's 2014 federal income tax return Form 1040 reflects earned income on Line 7 of $194,143 and includes W-2 Wage and Tax Statements from nine HHAs.  Her 2015

federal income tax return Form 1040 reflects earned income on Line 7 of $177,391 and includes W-2 Wage and Tax Statements from eight HHAs.[4]

**<u>Contact with Beneficiaries</u>**

42.    Telephone records associated with OGUNBIYI's known telephone number (XXX-XXX-4140) demonstrate that she had telephonic contact with at least five of the beneficiaries she purportedly provided with PCA services: B-2, B-13, B-3, B-14, and B-8.

43.    Telephone records from October 1, 2016 through June 2, 2017, were crossed referenced with sixty-three possible telephone numbers for twenty of OGUNBIYI beneficiaries. During the aforementioned period, OGUNBIYI was billing D.C. Medicaid for eight beneficiaries.  Further analysis revealed that in an eight-month period, OGUNBIYI made 218 telephonic contacts with five of the beneficiaries.

## B.    BILLING AS DEBORAH BROWN UNDER NPI ENDING -2761

44.    In October 2018, the investigative team received information about OGUNBIYI's contacts with a CHS, to whom OGUNBIYI was paying illegal kickbacks.[5]  A review of the CHS's Medicaid claims data revealed that OGUNBIYI used a second NPI number to submit false timesheets to HHAs.   The investigation showed that from at least January 1, 2014 through

---

[4] The federal tax returns referenced in Paragraph 41 were filed under the name "Temitope D. Oluwa Bakare Ogunbiyi" using a Social Security Number ending in -1346.   The investigation revealed that OGUNBIYI also is using the name "Deborah T. Brown" with a different Social Security Number ending in -6459.  A request for federal tax returns under the other name and Social Security Number is pending.  Notably, in March 2016, to combat fraud, Medicaid implemented a daily ceiling on the number of hours that a PCA can bill to 32 units or 8 hours under the State Plan. Any additional PCA services needed in excess of eight hours would fall under the Waiver program and require additional authorization.  After that date, OGUNBIYI's purported hours worked dropped.  She also reported significantly less earned income on Line 7 of her 2016 federal income tax Form 1040, of $46,912, and generally from no more than *two* HHAs on a single day.

[5] The CHS, who was paid compensation for working in an undercover capacity, initially was working on a separate investigation involving a PCA named Nkiru E. Uduji, also known as "Nikki/Nicky" and "Kimmie."  In October 2018, information was developed in the Uduji investigation that showed that Ogunbiyi was working with Uduji to pay the CHS to sign timesheets for Ogunbiyi for services that were not rendered. Thereafter, the CHS simultaneously worked on both the Uduji and Ogunbiyi investigations.

September 28, 2018, OGUNBIYI used NPI ending in -2761 to file false timesheets with HHAs under the name "DEBORAH BROWN." Throughout the course of the investigation, law enforcement had learned that OGUNBIYI sometimes used that name and was known by some of her Medicaid beneficiaries as "DEBORAH," "DEBRA," or "DEBBIE."

45.     Under NPI ending in -2761, OGUNBIYI allegedly worked for up to eight different HHAs and allegedly provided PCA services to approximately sixteen beneficiaries. She purported to provide PCA services to between one to four beneficiaries at any one time.

46.     As she had done under NPI ending -4649, OGUNBIYI committed Medicaid fraud using NPI -2761 in several ways, including paying unlawful kickbacks and submitting timesheets for PCA services not rendered.

47.     For instance, the CHS told investigators that since 2014, it has been a Medicaid patient of "DEBBIE." The CHS identified a photograph of OGUNBIYI as the person it knew as "DEBBIE." The CHS explained that "DEBBIE" is supposed to provide the CHS with three and one-half days of PCA care per week. However, from 2014 up until about September 2018, "DEBBIE" did not provide the CHS with any PCA services. Instead, the CHS received as much as $60 a week in kickback payments to sign fraudulent timesheets for "DEBBIE." For the period of September 16, 2014 through the present, OGUNBIYI, using the NPI ending in -2761, has billed D.C. Medicaid for PCA services she has not provided to the CHS. OGUNBIYI's actions caused Medicaid to be fraudulently billed approximately $153,672 for services she did not provide to the CHS.

### C.     CONSPIRACY TO DEFRAUD MEDICAID WITH OTHER PCAs

48.     The CHS also informed investigators that another PCA, identified as Nkiru Uduji ("Uduji") or "Nikki," worked with "DEBBIE" to pay the CHS to sign timesheets falsely attesting

to the hours each PCA worked.  The CHS said that Uduji and "DEBBIE" did not provide it with any PCA services.   Instead, Uduji paid the CHS $100 weekly to sign false timesheets for Uduji and "DEBBIE."  The CHS understood from Uduji that half of the money that Uduji paid it came from "DEBBIE" for signing "DEBBIE's timesheets for the NPI ending in -2761.  In September 2018, the CHS reported that Uduji stopped coming to ask it to sign the timesheets for Uduji and "DEBBIE."  In Uduji's place, "DEBBIE" began coming and paid the CHS $50 to sign only "DEBBIE's" timesheets.  "DEBBIE" still did not provide the CHS with any PCA services.[6]   As of October 2018, the CHS immediately met with law enforcement after OGUNBIYI paid it and turned over the money from OGUNBIYI to the investigators to be booked as evidence.[7]

49.     The investigation shows that OGUNBIYI and Uduji have a long-standing friendship of over a decade and that Uduji wrote a letter of reference for OGUNBIYI in connection with an application for a PCA position. Telephone records associated with OGUNBIYI's known telephone number (XXX-XXX-4140) and Uduji's known telephone number (XXX-XXX-8029) demonstrate that both PCAs were in telephonic contact with each other.  A review of toll records obtained for OGUNBIYI's cell phone reflect numerous contacts between OGUNBIYI and Uduji, the longest call lasting approximately 40 minutes.

51.     The CHS also recorded several interactions it had with OGUNBIYI and Uduji, in which the PCAs referenced their illegal payment of kickbacks to not only the CHS, but to other beneficiaries.  During an October 2018 recording, OGUNBIYI made statements to the CHS explaining that Uduji stopped coming because the CHS was talking to authorities.  OGUNBIYI reminded the CHS not to speak with anyone about their kickback arrangement and directed the

---

[6] Uduji is being charged in a separate complaint.

[7] The CHS had been separately providing law enforcement with the payments from Uduji.

CHS to tell anyone who inquired that they did not give the CHS anything.   Additionally, in that

conversation, OGUNBIYI referenced the illegal kickback payments made to the CHS by

OGUNBIYI and Uduji averaging about $400-$500 per month.  OGUNBIYI offered to refer the

CHS to a new, yet unidentified, PCA who would have the same arrangement with the CHS that

OGUNBIYI and Uduji had.  Specifically, the new PCA would not come to work, but would pay

the CHS in exchange for the CHS signing timesheets for hours the PCA did not work.

OGUNBIYI explained to the CHS that the new PCA's payments would replace the money the

CHS lost when Uduji stopped coming.

51.    Similarly, during an earlier recording between the CHS and Uduji, references

were made to the illegal kickback payments Uduji and "DEBBIE" made to the CHS.  Uduji also

alluded to paying multiple beneficiaries to sign timesheets for hours she did not work prior to

Medicaid tracking the NPI numbers.

## V. CONCLUSION

52.    Based on the foregoing facts, and information gathered thus far in the

investigation, there is probable cause to believe that in the District of Columbia and elsewhere,

OGUNBIYI alone and together with at least one other PCA, knowingly and intentionally

conducted a scheme or attempted to conduct a scheme to defraud D.C. Medicaid by submitting

false timesheets to HHAs that caused D.C. Medicaid to be billed and OGUNBIYI to be paid, for

PCA services she did not provide or that were tainted by the payment of illegal kickbacks, from

on or about January 1, 2014 through on or about September 2018.[8]  OGUNBIYI's conduct

constitutes Health Care Fraud in violation of 18 U.S.C. § 1347 and Conspiracy to Commit Health

---

[8] OGUNBIYI continues to commit fraud by paying the CHS to sign timesheets attesting to the receipt of PCA services not rendered.  September 2018 is the last month for which billing data was available before the filing of this Affidavit and is being used herein as an end date for purposes of illustration only.

Care Fraud in violation of 18 U.S.C. § 1349, as well as Health Care False Statements in violation of 18 U.S.C. § 1035, and violations of the Anti-Kickback Statute, 42 U.S.C. §§ 1320a, 1320(b), 1320(f)(1 – 2).  As a result of this fraud, OGUNBIYI caused the D.C. Medicaid program to suffer an approximate loss of $1,071,247.12.

_____
**Special Agent Jynika Craig**
**Federal Bureau of Investigation**

**Sworn to and subscribed before me this _____ day of October 2018.**

_____
**Magistrate Judge**